Mr. Sundback for the petitioner. Ms. Perry for the respondent. Good morning ladies and gentlemen. Two things before we start. First of all, Judge Henderson unfortunately can't be with us this morning. She will listen to the tapes of this morning's arguments and she will participate in the decisions. Second, as you know, this matter has material that's been filed under seal and some of the parties may want to discuss that material in the argument. We have received consent from all of the parties, including the interveners, to address that in open court and therefore we will not be closing this argument. Counsel. Thank you, Your Honor. Good morning, Mark Sundback for ANR Storage. I'd like to reserve three minutes for rebuttal. This case presents a textbook example of a failure to engage in reasoned decision making. The results are evident in paragraphs 215 through 220 of Opinion 538. There are conclusory allegations contained in those passages that are simply inconsistent with the body of the order that made repeated, specific findings based on a voluminous record that constitute a basis of substantial evidence. So, for instance, in paragraph 219, the Commission expresses concern about what it characterizes as the sheer number of facilities that would either have to acquire 284 authorization or release capacity in order to police a potential exercise of market power. In that paragraph, it also asserts that a substantial number of intrastate providers would all need to enter the interstate market with available capacity. Those assertions are simply inconsistent with many passages. There's certainly a lot of tension between what FERC says when they're defining the product market and when they're addressing good alternatives and what they say at the end when they're addressing whether market power will be constrained. But can't we consider that issue as really a question of degree? How good are the alternatives? And FERC is saying they're okay, but not perfect. And when they end up with a situation where, if I understand the calculations, the intrastate component of the other suppliers is way over 50% of the relevant market, can't they say that's concerning? Well, you don't have to take ANR's word for it. You have only to take the Commission's word for it. Paragraph 184, quote, intrastate providers themselves were good alternatives, end quote. The Commission criticized the interveners for presuming that they couldn't be good alternatives. Good but not perfect. I mean, surely an intrastate provider would be not as good an alternative as an interstate, right? Not sure we'd agree with that, Your Honor. Well, you have to get the certificate. You have to put yourself in a wholly separate regulatory scheme. It takes time. No, Your Honor. I disagree with that for several reasons. Intrastate capacity, the Commission itself found, is a good substitute. Second, even if an intrastate pipeline wants to provide interstate service, under the Commission's regulations, intrastate pipelines can provide interstate service to interstate pipelines or LDCs served by those interstate pipelines without further authorization. Part 284.122a of the Commission's regs says if you're an intrastate pipeline, you're already authorized to do that. So the, you know, the boogeyman of having to convert is a fallacious one. Additionally, we have many examples in the cases cited in the briefs where capacity that was in intrastate commerce is either leased to an interstate pipeline or assets are sold to an interstate pipeline that already has a blanket certificate. There are many different ways that these facilities, this capacity, is readily usable without further authorization. The record is replete with examples of entities that have section, NGA Section 3 authorization already to import and export gas from Michigan to Ontario. And that in itself undercuts or affects the market fray in our storage. I'm sorry, I thought all parties briefed this as if an intrastate provider needs to get a 284 certificate in order to enter the interstate market. And there was just dispute about how long that takes and how burdensome it is. And you all said, well, it can happen within a year, so it's no big deal. Your Honor, the 284 authorizations can either be pursuant to a specific application by the applicant or it's the extended entity is an intrastate pipeline. The 284 authorization already exists in the commission's regulations. So there's no need for conversion. You can convert, and we demonstrated that conversion can happen readily within a year. But there's no need to convert in order to impact pricing and demand for interstate service. While you're there, I looked for and didn't find, and I may just have overlooked. But what is the intrastate storage companies, how do they set their pricing? Is that market-based or cost-based or something else? That's a good question. It's both. Some intrastate entities have cost-based rates. Some have effectively market-based rates. For instance, there's certain storage capacity provided intrastate in Michigan, which it's our understanding has market-based rate authorization. Okay. When you say that the intrastate providers don't need to convert in order to have an impact, is that because you're now saying that they can enter the interstate market without any further authorization from FERC, or is it because of your argument on the demand side that even if they stay in the intrastate market, consumers can buy from them rather than from the interstate providers? Both, Your Honor. Okay. Part 284.122a. Okay. The allegation, the conclusory assertions in paragraphs 215 through 220 also ignore, for instance, the availability of currently deactivated interstate storage, which can be reactivated. The Wabash and Columbiana fields were referenced in the record. The Commission simply ignored those with regard to A&R Storage's argument that entry is easy. A&R Storage sponsored extensive testimony from the only reservoir engineer in this case that there are over 2,000 potential usable containers of depleted gas storage fields just in Michigan alone with an aggregate capacity substantially in excess of 2,000 BCF. The Commission never got to that. Instead, it dismissively said, without any citation in the record, well, it's unlikely that that's going to cause A&R Storage to no longer be the largest storage provider. In fact, if the Commission had simply looked at the rebuttal evidence, which it itself concluded was erroneously ignored by the initial decision, it would have seen that A&R Storage is neither the largest storage provider by working gas capacity or daily deliverability. So A&R Storage ranks number three on daily deliverability. The Commission ignored the fact that in one single order, in the Blue Water order, which involves a storage capacity previously intrastate in Michigan, so it was in the central Great Lakes market, the Commission authorized for market-based rates more daily deliverability than is impacted or requested for all four of the A&R Storage fields here at issue. So in Blue Water, they authorized market-based rates for over 826 MMCF a day of daily deliverability, 110% of what A&R Storage is asking for. So this shimmer of A&R Storage is the largest is, A, incorrect. The Commission recognized that the initial decision committed error by not recognizing the... But the Commission recalculated the shares, and on working gas, A&R came out at 16.1 or 2%, and they were the market leader. And if you assume, let's assume for the sake of argument that we reject your claims with regard to rehearing and that those two points would drive up A&R's share a little bit more, I think it goes from something like 16% to 20%. Those are their findings, and I don't think you challenged any of them as unsupported. Your Honor, we contended that they were contrary to the record. And in any event, the Commission has authorized market-based rates in instances of market shares of over 20%, like the Petal case. Do you have any cases where they have authorized market rates at level where the applicant is the market leader? In Petal, the third Petal case, which is 2003, Petal had a market share of 20.6% for daily deliverability. It was affiliated with El Paso Energy, which is a significant participant in the natural gas market. And while it didn't acknowledge that it was the largest entity in the market, I would think that it was. Similarly, in One Oak, the 2000 case, One Oak had almost a 22% share of daily deliverability in the market, and that likely made it the largest participant. It had five storage fields and was leasing to an interstate pipeline another storage field. So there are other instances with market shares in excess of what A&R had, where the Commission has nonetheless authorized market-based rates. What is DTE's share? DTE's share is between 14.8 on working gas, and daily deliverability is 16.57. DTE, just during the time that lapsed between the initial filing of the application for market-based rates and the actual hearing of this case, added 4,500 or 5,000 of working gas capacity just during that period of time. Did you argue before the Commission that it should approve A&R's application because A&R's application is essentially indistinguishable from DTE and DTE's application was approved? Yes, Your Honor, we did. In the rehearing petition? Yes, that is correct. Did you do it in the main proceeding? There's a testimony from Mr. A&R witness Sullivan, and I don't remember the joint appendix number, but I think it was at pages 19 and 20 of his rebuttal testimony where he also discusses DTE and Mishkan, which is an affiliate. So this was present in the case even in the evidentiary. That seems to me a pretty strong argument for you, and I'm just puzzled why it has so little development before the ALJ who mentions Mishkan in passing but just only as another data point on share. As far as I can tell, the Commission doesn't mention it at all, and the first time it really comes up is on rehearing. Well, the record also shows that Mishkan was directly competing to take customers from A&R storage. The record shows that. That raises a question in my mind. Tell me if this is correct as a matter of economics. If you only have one market-based pricing entity within the relevant geographic market, all the rest are cost-based, and it's only one, in this case DTE, putting aside the entrustment, wouldn't it be true that the market-based company would have to either equal or undercut the cost-based suppliers or storage companies? Because otherwise it has no business. All other things being equal, that's certainly true, Your Honor. But the dynamic changes if you have more than one market-based company in the mix. Does it not? It depends on the market metrics and the profile of the market, I believe, Your Honor, not as an economist but a common-sense regulatory lawyer, to the extent that actually even everybody is entitled to charge market-based rates. If the market is workably competitive, then you're getting the results of a competitive market. In fact, the Commission found in Blue Water that a subset of the Central Great Lakes market was highly competitive, and similarly in the Orbit case, which contains a subset of the Central Great Lakes market, the Commission stated that it was a competitive market. So DTE is charging market rates in this market. I think I saw some other participants were. Yes, for instance, Blue Water, which is located pretty close to A&R in Michigan, was authorized to charge market-based rates, once again, for about more than half of the working gas capacity of A&R's storages fields at issue and more than the daily deliverability of A&R's storages fields at issue. WPS, cited in our briefs, is also an example of market-based rates. And I believe LE8, the L-E-E-8 case, also involved market-based rates in the market. And it's not a surprise, given the fact that, for instance, the Ohio storage capacity is undersubscribed. So there's available capacity out there. So market-based rates in an environment like that work very well. Ontario has also market-based rates for some of its providers. Just going back to intrastate providers for a minute, assuming you're correct that they either don't need or can easily get authorization as a matter of FERC law to come into the interstate market, what do you do with the argument that I think FERC hints at and that the interveners really press, which is there may be a lot of other legal or economic constraints under state law, perhaps under Canadian law, so even if you can easily get the FERC certificate, you might be barred by Michigan law, you might be barred by your own contracts. A lot of that capacity might be unavailable for other reasons. We only have to look at the real world to see how fallacious that argument is, Your Honor. For instance, in the East Ohio cases, we see that unsubscribed capacity held by the local distribution company is offered to interstate service in part because of the concerns that the local distribution company will face when its rates are reviewed by the State Regulatory Commission. Mr. Sullivan points out that because of the obligation to furnish service at the lowest reasonable cost, local distribution companies have a powerful incentive to release their capacity and see if there's a home for it in the interstate market. Another good example of that is the Central Oklahoma case where that took place. Similarly, the One Oak case, as we mentioned before, involved One Oak leasing capacity to Natural Gas Pipeline Company of America, the Sayer Field, to redeploy that, presumably to earn more revenues. There are a legion of examples where intrastate, formerly intrastate facilities are moved over into the interstate column, and a large part of that is because the economic incentives to redeploy idled capacity or try to capture higher value. If I could loop back to an earlier question, and I'm sorry for the disjointed nature of the answer. You had suggested, if memory serves, that intrastate capacity, simply by being intrastate, was inferior to interstate capacity. As a substitute in the interstate market. We'd like to point out that a lot of intrastate capacity is closer to load to the consumer than interstate capacity. A&R Storages facilities are a perfect example. They're in the middle of a field in the middle of Michigan. They're not sitting right under Detroit. In contrast, local distribution facilities, like those, for instance, of Dominion or East Ohio, are right under the municipalities that they serve. So, in that sense, they're more flexible. They're right there. There's a lower transportation cost to bring that gas to the market. That's a competitive advantage that the intrastates have that interstates often don't. Can I ask one thing I noticed in the record, which no one makes much of, is that in, I think, 2011, the commission conducted an investigation of your clients' rates and found them to be super competitive, something like 130, 150% return on equity. Wouldn't that be pretty compelling, pretty direct evidence of market power that could inform the commission's concern? No, Your Honor. As we've seen, for instance, in the ExxonMobil case and the Mobile Pegasus case, this court, as well as the commission, that using the yardstick of a particular entity's cost as a measure of whether there's market power exercise or not is not a reliable measure. An entity may be largely depreciated, and, therefore, the marginal cost supplier might experience costs substantially in excess of a particular- may be in the abstract, but FERC pressed that case and extracted a settlement which resulted in your client having to charge substantially lower rates. So they thought, in that proceeding, that the rates were super competitive. In that case, why was the market, a subset of the Central Great Lakes market, found to be highly competitive by the commission in the Blue Water case? Blue Water's in the same state, in the same market, had more daily deliverability than A&R Storage. The commission said, fine, market-based rates for you. It gave market-based rates for WPS, also in the same market. They're irreconcilable to conclude that there's apparently a monopolist at large in that market, but, nonetheless, it's highly competitive, and an entity that actually has a greater market share than A&R Storage should be able to go out and, if that represents monopoly power, exercise it. It's logically- it's illogical from our perspective. Thank you, Counsel. Thank you. Good morning, Your Honors. Lona Perry for the commission. I would like to begin with the last point first. I would like to point out that, although he keeps repeating that there have been other people, other entities in the Central Great Lakes market that have received market-based rates, I want to point out that the inquiry that we're engaging in here is not whether the Central Great Lakes market is workably competitive. This court has affirmed the fact that what the commission looks at is not whether the market as a whole is workably competitive, but whether or not this particular applicant is in a position to exercise market power in that market. And I would point out to you that Orbit Gas and Blue Water and WPS ESI were all very small entities. Orbit had 3.3% working gas, 10.45% deliverability. Blue Water had- Fair enough. But DTE has 14.5% versus ANR's 16%. And FERC approved market rates for DTE. And I don't- it was some time ago, but I don't think the shares were materially different when FERC approved DTE's application. A couple points about that, Your Honor. In the first place, it cannot be a reason to grant ANR market-based rates when it has market power that somebody else in the market has previously been given market-based rate authority. As they say in their brief- But if there's no sustainable distinction between ANR's position in this market and DTE's position in the identical market, the core obligation of reasoned decision-making is to treat like cases in the same way. Yes, Your Honor. And let me explain that DTE Energy was not similarly situated to ANR Storage. ANR Storage aggregated with the TransCanada affiliates at the time it was granted market-based rate authority. For one thing you have to bear in mind as we discuss in our brief and in the orders, DTE Energy is composed of two affiliates that are intrastate facilities. And they operate at cost-based state-regulated rates with regard to the local distribution services they provide. So the market-based rate authority that they were granted is for essentially incremental sales that are made in the intrastate market. None of this is in the Commission's order on rehearing, though. No, Your Honor. The Commission's order on rehearing doesn't discuss this expressly. Even though the petition, the rehearing petition did. Yes, Your Honor. But at the time, and also in addition, well, the orders do, Your Honor, talk about the fact that DTE Energy, it's in the discussion of all the individual competitive alternatives. And the Commission, the initial decision and the Commission, talked about the fact that DTE Energy operates at a considerable amount of its capacity as it costs state-regulated cost-based rates. And so when it received market-based rate authority, it was pursuant to its service under Section 311 of the Natural Gas Policy Act, which allows intrastate facilities to make some intrastate transactions. I'm sorry. Let me just make sure I understand it. You're saying that while DTE at 14.5% might look a lot like ANR at 16% at first glance, they are different because much of that 14.5% is in an intrastate market, and when FERC granted market authority to DTE, it was only for a narrow subset of the 14.5%? Yes, Your Honor, that's correct. And you can see that, and that is in the orders, the discussion of DTE Energy, and in the discussion of ANR. Where is that in the main FERC order? I didn't see anything on this point about inconsistency as between ANR and DTE. The DTE discussion in the initial decision is Joint Appendix 151. It's all Paragraph 493, but that goes on for many pages. And the Commission's— While you're giving us citations, would you also tell us where in your brief the argument that you just made about DTE appears in your brief? At pages 40 to 42, Your Honor, is where we discuss the composition of the individual competitive alternatives, and that includes the discussion of DTE Energy. DTE Energy was— I thought it was on pages 28 to 29. Am I wrong about that? Did you discuss— Discuss the arguments about the previous market-based rates to Michigan Consolidated and to Washington Tent. But what I'm talking about now is the discussion of the composition of DTE Energy. This is just—all I see on DTE is you list—you categorize DTE as one of the many competitors that has some interstate, intrastate capacity in the course of making your argument that there was a lot of intrastate capacity, which heightens your concern about this market. Right, Your Honor. But that is exactly the point, is that they are largely composed of intrastate— That seems like a pretty oblique way of dealing with the pretty obvious argument that this is a market structure in which there are two leading competitors whose shares seem to be virtually identical, and all the dynamics about intrastate versus interstate and how much capacity there is under the ground in Detroit, Michigan or whatever, it's all the same. It's the same market. And one of the two leading competitors approaches you for permission to charge market rates, and you grant it. And then the other one approaches you and you deny it without any obvious explanation of why you're treating these companies differently. Well, Your Honor, it is absolutely part of the record that DTE Gas, its Michigan-consolidated subsidiary, had 79,970 million cubic feet that were committed to intrastate storage. That is in the record that's in our brief, and that's all I'm talking about is the fact that they are not an intrastate entity in the manner of A&R and the TransCanada affiliates. That's absolutely in the record. And at the time, additionally, at the time, as we pointed out in our brief, at the time that the market-based rates were granted to DTE Energy for that incremental federal service, that A&R Storage and the TransCanada affiliates were charging cost-based rates. And in the case of the New York-Pennsylvania market, for example, the commission has found that entities operating at commission-regulated cost-based rates can control the ability of smaller entities to exercise market power. That rationale was not in the agency decision. That rationale certainly is in the agency decision, Robert. It's okay. The competitors are otherwise identically situated, but it's okay to treat one differently based on who files first for market-based authority. I mean, that's in your brief. That's in the red brief, but I don't think it's in the commission's order. It is certainly in the commission's order. If you look at Paragraph 215 of Opinion 538, the Joint Appendix 261, there is certainly a discussion there of the Wyckoff case, which is a case where there was a 16% market share, and the commission found that the 16% market share, although it might ordinarily present market power concerns, was not a concern because there was an incumbent in the market that had 42% of the market share that was operating at commission-regulated cost-based rates. I mean, that's a fair distinction of Wyckoff. I'm not sure it directly answers the concern about DTE. The point is, Your Honor, not that DTE got there first. It's not that A&R Storage couldn't have market-based rates if it could show that it did not have the ability to exercise market power. It's not that there was some limited access to market-based rates that DTE Energy somehow took up. Everybody in the market could have market-based rates if they individually could show they are not in a position to exercise market power. All this seems so reminiscent of the equal protection cases. It occurred to me, if you take a case where there's a higher age requirement, a drinking age requirement for males than there is for females, which is a famous Supreme Court case. The remedy for that, there are two remedies. One is to lower the male's drinking age, and the other is to raise the female's drinking age so they'd be equal. As I read your brief, it was that kind of thinking that went into your argument that says, well, it may be that DTE is similarly situated in charging market-based rates, but the remedy for that would be to reopen and vacate the orders that allowed them to charge the market-based rate. But how do you choose between the two? The other remedy for it is to grant ANR's request for them to charge market-based rates. But, Your Honor, the point is that that's... That's a long question, I'm sorry. No, no, I understand. I understand your question. The point is that the second part, that second remedy, is not possible here because awarding ANR storage market-based rates when it has not demonstrated that it cannot exercise market power would be an unjust and unreasonable rate. The Commission does not have statutory authority to grant the second, which is why even in Petitioner's brief at page 31 and in their rehearing request at 29, they make a reference to the fact that you would have to go and re-vacate other people's market-based rate authority, and they didn't ask for that remedy here. So I understand the argument that they're not similarly situated because you're only talking about a narrow sliver of their capacity, but just assume hypothetically they are. Judge Randolph raises the question about leveling up or leveling down, and the Supreme Court, in those equal protection cases, said that the disfavored party has standing to raise the claim about differential treatment, even though, in theory, the regulator could treat everyone less favorably. And DTE seems like they're in that position, and they didn't go to the Commission and say we're being unfairly disadvantaged, so you should therefore take away—I'm sorry, ANR didn't go to the Commission and say we're being disadvantaged and therefore you should take away DTE's advantage. They went to the Commission and said, look, you've granted this for an identically situated competitor on the hypothetical, and you have an obligation to treat like cases similarly, so grant it for us. So they sought a level-up remedy, not a level-down remedy, and they're generally allowed to do that. They could seek the remedy, Your Honor, but the point being that unless they established that they lacked market power, which they failed to do in this case, the Commission is not at liberty to grant them market-based rates. The Commission, under the statute, is required to regulate the rates unless it can be determined that the rates will be just and reasonable because that individual applicant is not able to exercise market power. So the Commission didn't have the option of granting market-based rates in the absence of showing that ANR storage could not exercise market power. Thank you, Your Honor. On the intrastate point, there does seem to be a fair amount of tension at best, internal inconsistency at worst, between the way the agency treated the question of market definition and the question of good alternatives from the question of whether other competitors can constrain market power. In order to put competitors into a relevant product market, the agency quite correctly cited the basic antitrust standard, which is the competitor needs to be not just a somewhat good substitute but a reasonable substitute, one that will actually have a practical effect on the options available in the market. And likewise, when you addressed good alternatives, your own standard for that is that the alternative has to be available quickly enough, at a price low enough, and a quality high enough, that buyers regard it as a good option. And once you say all that, it seems a little bit difficult to turn on a dime and say, oh, yes, but even though we've said all that and even though they're in the market, we don't think that their presence will constrain. Your Honor, what the Commission found was is that as to any individual intrastate competitor or alternative, that each individual intrastate competitor should be included in the market because on an individual basis it could be regarded as a good alternative because there is the possibility that committed intrastate storage can be released into the market. And that is the big concern with the intrastate storage, by the way, Your Honor, is the fact that so much of this, as the Commission found and the initial decision found, was committed to local distribution service. And there's a serious issue about how much of that could be released into the intrastate market because it is already committed to local distribution service. And the – Is that – so let me ask you about that. Is that the same as what you call the capacity release issue? Well, it is a question about whether you can release that capacity because you are obligated to serve that retail load with certain amounts of your capacity and that prevents you from being able to release that to certain amounts. The argument, as I understand it, is there's all this intrastate capacity and you don't seem to really dispute very much the proposition that as a matter of FERC law, it's fairly easy to get authorization to shift from intrastate to interstate. But there are all these other state law constraints or Canadian law constraints or whatever. Is that – It's state law constraints, but it's also just the fact that so many of these entities are local distribution companies and they have retail load. And the retail load comes first. And they can only release or sell in the intrastate market what they don't need to serve their retail load. And that was the concern about – because all of the capacity of all of these entities was being counted in the market. I understand the point conceptually, but it's very hard to tease out of the FERC opinion. Well, no, Your Honor. They just go through – they make all the conceptual points about why intrastate is a reasonable substitute and a good alternative. And then they apply that and go through each of the 19 companies and reverse company after company on exclusion because they didn't have the certificate. And then they just recalculate the share and come up with 16%. And then just kind of ips and dicks it. They say, oh, but we have a concern. about all of these good alternatives that we've chosen to put into the market? No, Your Honor. What the commission said was in paragraph 219 of opinion 538, which is 262 of the joint appendix, it acknowledged that each one of the intrastate facilities that was at issue was included in the product market because it's theoretically a good substitute. But a significant number of them would have to get certification and or release capacity in order to prevent an exercise of market power. And when you look at, for example, opinion 538 of paragraph 162, joint appendix 244, the commission there is explaining with regard to good alternatives, available alternatives are those that are unsubscribed or reasonably expected to become available. And the question is, in the aggregate, what quantity of good alternatives could reasonably be expected to become available given that so much of the service of these particular entities was committed to retail load? One more question along the same lines, which is, as I understand it, the reasoning in the commission's order and what you just said is a concern that not all of the people that you, not all of the intrastate providers that you put in the relevant market would shift over into the intrastate market. And that is your answer to the point about supply side substitutability. You made a wholly separate point when you decided to put them in the market about demand substitutability. And as I understand it, the point is that even if they stay in the intrastate market and never come over in the intrastate market, they will constrain market power because from the perspective of the buyers, right, gas is gas. They can just buy from intrastate providers. And I didn't see any explanation of why that point won't constrain market power. Well, what the commission said about that, Your Honor, in rehearing order at Paragraph 37, Joint Appendix 289, is that the commission said There's one sentence that says the demand effect by itself isn't enough. Holy conclusory with a cite to the FERC opinion that doesn't really support that proposition. What the sentence actually says, Your Honor, is that A&R Storage failed to show that the demand effect alone would be sufficient to check market power. And they have 10 pages in the blue brief which look somewhat plausible. And I assume they made that case equally forcefully before the commission. And there's just no answer to it that I can tell, that I can stop. Well, what the commission said, if you look at Paragraph 108 of Opinion 538 at 221, about the demand, the commission's example. I'm sorry, I'm talking too fast. Opinion 538, Paragraph 108 at 221 of the Joint Appendix. Okay. The commission there is talking about the demand effect. And their example of how the demand effect works is if you have a local distribution company that needs storage service and it can turn to its own storage service as opposed to using A&R Storage's service, then you should consider that to reduce overall demand. But the point being that A&R Storage is an interstate facility. It has 12 customers that use interstate storage. And the issue is whether what the commission found was is that simply the fact that the existence of intrastate storage may at some point and at some times be useful to customers of A&R Storage doesn't answer the question about a sufficient supply of interstate storage, which they need for at least some transactions. And so you have to show both the demand and supply effect on the interstate market. Okay. Do you want to ask about the 2011 investigation, which just as a non-expert seemed to me something that would be a significant arrow in your quiver, but you didn't choose to make much of it. So am I wrong to think that that could have been pretty good evidence in your favor? Well, Your Honor, it certainly does suggest that A&R Storage was able to charge super competitive rates to its customers and was able to do that for a considerable period of time. But the commission didn't rely on that as being evidence of market power. And they did the straightforward analysis from the policy statement. So I guess we can't then, I guess. Well, the commission did not rely on that as evidence of market power, Your Honor. If there are no further questions. Thank you, Counsel. We'll give you a couple of minutes. Thank you, Your Honor. In no particular order, what we heard just now in part is a remarkable effort, inconsistent with the Chenery standard to try to, in essence, apply Bondo to 538 and make it more presentable. To start, over with regard to cost-based rates, the reply brief of A&R demonstrates that over half of Central Great Lakes markets charge the cost-based rates. So to the extent that we're looking at the New York and Pennsylvania market cases where the commission pointed to at least 42% of the rates being based on a cost basis, there's not a cognizable distinction there. The counsel for the commission wanted to argue that there was a very narrow slice of DTE capacity subject to market-based rates. In this case, A&R storage's capacity for which it's seeking market-based rates represents approximately 3.6 of working gas, according to the total market calculated by the commission, and 2% of daily deliverability. Where do we get that? That sounds new to me. The application itself says that we're seeking market-based rate authority for four fields, Cold Springs, Excelsior, they're listed there, and they have a total of 750 a day of daily deliverability. Right, but the case was litigated before FERC on the assumption that your client has these four fields, and FERC sifted through all the evidence and came up with the 16% number. And that represents an attribution of affiliates' capacity, which are charged at cost-based rates. Oh, I see. What we just heard from the solicitor was an attempt to distinguish DTE because DTE almost has a subset of its capacity. You're saying it might be fair to treat ANR as encompassing all of TransCanada when calculating the shares, but that doesn't change the fact that it's just ANR. The ANR part of TransCanada is 3% rather than 16. The particular fields for which market-based rate authority, and once again, if I understood the solicitor's argument, we shouldn't presume that all DTE capacity is charged at market-based rates because some is charged at cost-based rates. That's true on both sides. So it's an apples and oranges comparison to take the 16% market share that's attributed in Opinion 538 to all of the ANRS affiliates and compare that to 2% or 3% for DTE. Sauce for the goose is sauce for the gander. Very well, thank you. But that does take us seemingly way beyond anything that's in either the commission's order or the briefs. Fair enough. The solicitor also hasn't explained why the commission repeatedly in other decisions included intrastate capacity, storage capacity, in its definition of the market. The commission, for instance, in the Orbit case. There seem to be at least a handful and maybe many cases where they treat intrastate capacity as part of an interstate market. But do any of those cases discuss the particular feature of this market which concerns FERC, which is that it's not just intrastate capacity on the margin. It's more than 50% of what we're talking about with a lot of different intrastate providers so that even if it's a slightly less good substitute, this could be a problem in the aggregate. Is that issue addressed in any of these cases? That's a great question, Your Honor. In Orbit, the commission, which involves a market that substantially overlaps the Central Great Lakes market, includes, if memory serves, Indiana, Illinois, maybe downstream Ohio, as well as a part of Kentucky, which in fairness is not part of the Central Great Lakes market. The intrastate facilities were included in the market power study. The commission said that that represented a proper assessment of market, of good alternatives consistent with the commission's criteria. So it endorsed explicitly the inclusion of intrastate facilities in a market that overlapped the Central Great Lakes market. Once again, back to Blue Water, the commission issued market-based rate authorization of Blue Water. There was not, and in fact, Blue Water exemplified the transition from intrastate to interstate. The commission never said in that order, oh, we're concerned because after we've done this, we're going to have to worry about whether there are other intrastate storage capacity providers who will need to convert. There's not a hint of that in that order. Finally, the commission attempts to avoid the issue with regard to DTE by saying that it can't authorize what it characterizes as a not just and reasonable outcome under the NGA. But the Conway case that it cites in its brief stands for the proposition that the commission in setting just and reasonable rates must take into account competitive impacts. That was a price squeeze case. But once again, that principle should apply here because ANRS is disadvantaged relative to other competitors in the market. So if this court is inclined to reverse or remand the case, we ask that so long as DTE has market-based rate authority and is like ANRS market incumbent, not a new entrant like ANRS, has comparable market shares to ANRS, is located in the same state as ANRS. I think we get the point. Yeah. Thank you.
judges: Henderson, Katsas, Randolph